FILED
2014 Sep-24  AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

DONNA HAMLIN,                              *

              Claimant,                 *

v.                                                    *            1:13-CV-1466-KOB

CAROLYN W. COLVIN,                    *
Commissioner of Social
Security                                          *

             Respondent.

MEMORANDUM OPINION

I. INTRODUCTION

On January 20, 2010, Donna Hamlin, the claimant, filed a Title II application for a period

of disability and disability insurance benefits, alleging disability beginning on May 31, 2008. (R.

15).  She claimed inability to work because of her mental retardation, bipolar disorder, chronic

headaches, and chronic back pain. (R. 210).  The Commissioner denied the claim on March 22,

2010.  After filing a request for a hearing, the ALJ conducted a video hearing on January5, 2012.

On March 9, 2012, the ALJ determined the claimant was not disabled, as defined by the

Social Security Act from May 31, 2008, her alleged onset date, to the time of the hearing. (R. 26).

On July 12, 2013, the Appeals Council denied the claimant's request for review; consequently the

ALJ's decision became the final decision of the Commissioner of the Social Security

Administration. (R. 1).  The claimant exhausted administrative remedies, and this court has

jurisdiction pursuant to 42 U.S.C. §§ 405(g).  For the reasons stated below, this court affirms the

decision of the Commissioner.

## II. ISSUE PRESENTED

The issue before the court is whether substantial evidence supports the ALJ's finding that the claimant did not meet a listing under § 12.05(C) for mental impairments.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. However, this court does not review the Commissioner's factual determinations *de novo*; the court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a

question reserved for the ALJ, and the court "may not decide facts a new, reweigh the evidence, or substitute [its] judgment for that of the Commissioner."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

A person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42. U.S.C. § 423(d)(1)(A).  To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20. C.F.R.§ § 404.1520, 416.920.

The Eleventh Circuit determined that, for a claimant to be disabled under § 12.05, she must have "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." *Crayton v. Callahan*, 120 F.3d 1217, 1219-20 (11th Cir. 1997). To establish a disability under §12.05(C), a claimant must establish "a valid verbal, performance or full-scale IQ score of 60 through 70 *and* a physical or other mental impairment imposing additional and significant work-related limitation of function." *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993) (emphasis added). To display deficits in adaptive behavior, a claimant must have a full-scale IQ score between 60 and 70 and two of the following impairments: (1) marked restriction in daily living; (2); marked difficulty in social functioning; (3) marked inability to maintain concentration, persistence, or pace; *or* (4) repeat, extended episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05D.

The Eleventh Circuit, however, also determined that an ALJ is not required to base a finding of mental retardation on the results of an IQ test alone when he evaluates whether a claimant meets the requirements of § 12.05(C). *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *see also Strunk v. Heckler*, 732 F.2d 1357, 1360 (7th Cir. 1984) (finding that no case law "requir[es] the Secretary to make a finding of mental retardation based *solely* upon the results of a standardized intelligence test in its determination of mental retardation"). An ALJ is required to base his determination of mental retardation on the combination of intelligence tests and the medical report. ALJs should evaluate intelligence tests "to assure consistency with daily activities and behavior." *Popp*, 779 F.2d at 1499. If intelligence tests are inconsistent with the medical record and/or the claimant's daily activities and behavior, the ALJ would have a good

4

reason to discredit them.  *Popp*, 779 F.2d at 1500; *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th

Cir. 1992) (finding that a valid IQ score need not be conclusive of mental retardation when the IQ

score is inconsistent with other evidence in the record concerning the claimant's daily activities

and behavior).  When the evidence conflicts, "it is the ALJ's responsibility, not the court's, 'to

reconcile inconsistencies in the medical evidence.'" *White v. Astrue*, 2012 U.S. Dist. Lexis 44494,

*14 (W.D.N.C. 2012) (quoting *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976)).

## V. FACTS

The claimant was age 40 at the time of the administrative hearing and had an eighth grade

education. (R. 205, 41).  She previously worked as a home health aide, fast food worker, laborer

at a race track, yard laborer, and an assembly line worker. (R. 212).  The claimant initially alleged

that she was unable to work because of bipolar disorder, chronic back pain, and chronic

headaches.  However, during the hearing, the claimant presented new evidence and alleged

disability based upon mental retardation. (R. 35).

On appeal, the claimant did not contest the ALJ's findings regarding the impact of her

bipolar disorder, back pain, or headaches.  She only disputed the ALJ's determination about her

IQ and mental state. (R. 9).

### *Mental Limitations*

On April 12, 1983, Hillsborough County Public Schools Department of Student Services

administered the WISC-R to the claimant, at the age of 12.  She tested in the mentally deficient

classification of global intelligence with a full-scale IQ score of 61, and the score placed her in

special education classes. (R. 261-264).

On December 17, 1987, on a subsequent IQ test at the age of 16, the claimant received a

verbal score of 75, a performance score of 74, and a full-scale score of 73.  The licensed

professional counselor who administered the test, Fran Cronenberg, determined that the claimant

had borderline intelligence, but that her adaptive functioning was higher than her IQ. (R. 286-

287).

From 2002-2007, with a documented full-scale IQ score of 73, the claimant maintained a

series of jobs.  Her most significant employment occurred from 1997-2007 when the claimant

worked as a home health aide.  She worked 20-30 hours per week.  Her tasks included bathing

patients, administering patient medications, running errands, preparing meals, and cleaning the

house. She primarily cared for her quadriplegic brother-in-law in their home. (R. 221, 43).

On October 6, 2009, after a domestic violence dispute with her disabled brother-in-law for

whom she cared, Bonne Evans, a licensed social worker, at the Calhoun-Cleburn Mental Health

Center, evaluated the claimant after the district court judge's referral.  The claimant denied having

hallucinations, paranoia, or thoughts of suicide, but claimed symptoms of mood swings,

depression, and sleep disturbance.  She told Ms. Evans that she wished to get back on her

medication.  Ms. Evans assessed the claimant with a GAF score of in the range of 41-50,

indicating serious functioning impairments. (R. 387).

On November 11, 2009, the claimant returned to Ms. Evans at the Calhoun-Cleburn

Mental Health Center.  At this session, the claimant and therapist created a treatment plan to

address the claimant's temper and depression.  Her treatment plan included her future goals of

working at a nursing home or a warehouse job; taking care of animals; being married to someone

else; and taking care of a house.  The treatment plan outlined several rehabilitative aims, including

participating in counseling and taking medication, if needed, for her depression; cooperating with

6

the court referral program for domestic violence counseling and completing the court ordered intervention; recognizing signs of anger and taking a time out to manage her anger; dressing and grooming daily; and identifying three to four activities to manage stressors that lead to depression. (R. 392, 396-97).

On January 22, 2010, the claimant applied for disability; she listed bipolar disorder, chronic headache, and back pain as conditions that limited her from working. (R. 209-210).  In the corresponding Function Report the claimant listed that her daily activities included getting dressed, cooking meals, feeding pets, cleaning, and doing chores.  She also noted that she enjoyed playing computer games; could concentrate, depending on the topic, for up to an hour; went shopping and to doctor's appointments frequently; and could walk two miles before stopping. (R. 230-235).

On February 4, 2010, the claimant again visited Ms. Evans at the Calhoun-Cleburne Mental Health Center.  She reported that she managed her temper and took personal time outs when aggravated; cleaned her home, did minor repairs, and took care of animals; played Uno with her brother-in-law and spent time on the computer; wanted to travel to Florida to visit her nephews and mother; and applied for a job at a nursing home for which she was not hired.  She indicated that she filed more applications online and hoped to find employment in the near future. (R. 394).

On March 4, 2010, Dr. Maurice Jetter, a psychiatrist at the Calhoun-Cleburne Mental Health Center, diagnosed the claimant with mood disorder and possible depression; he proscribed Celexa 20 mg a day and Trazodone 100 mg as needed; and assessed the claimant with a GAF score of 55.  The claimant did not report any symptoms consistent with Bipolar Disorder.

(R. 498).

On March 5, 2010, licensed psychologist Dr. Richard Summerlin conducted a psychological evaluation of the claimant for the Disability Determination Service. The claimant reported taking two anti-depressant drugs, Trazodone and Celexa. Her mental evaluation showed normal orientation to people, place, and time; normal speech; vague remote memory functioning; abstract thinking ability; fund of general information; computational skills; and vocabulary representative of an individual with a lower than average IQ and less than a high school education. Dr. Summerlin determined the claimant had a learning disorder, relational problems, and borderline intellectual functioning. He noted that she could bathe, dress, clean, cook, drive, play online games, work puzzles, and shop. Dr. Summerlin concluded that the claimant's functional intelligence was greater than the IQ provided in the medical records he reviewed for his evaluation. (R. 401-403).

On March 8, 2010, the claimant received a physical evaluation from Dr. James Yates for the Disability Determination Service. She complained of back pain, numbness of hands, chronic headaches, and difficulties concentrating and staying on task. She told him that she could walk 25 feet but had to stop because of pain and that she could only lift up to 25 pounds. Dr. Yates found that the claimant had Athralgais, primarily of the spine, but he could not adequately evaluate it with the available information. He also noted that she had a history of depression, mental retardation, and chronic headaches. Dr. Yates determined that the claimant had insomnia and attention deficit disorder. (R. 407-408).

On the same day, Dr. Larry Dennis, a psychologist, evaluated the claimant for the Disability Determination Service on the criteria of paragraph B of listings § 12.02 and § 12.04. He

8

found that the claimant had a borderline IQ and a mood disorder that did not satisfy the criteria for either listing.  He determined that the claimant was moderately limited in her daily living activities; social functioning; and concentration, persistence, or pace.  She experienced no episodes of decompensation.  Dr. Dennis opined that the claimant's functional limitations did not satisfy the § 12.04(C) criteria.  He noted that she alleged bipolar disorder and determined that her claim was partially credible because of her mood disorder, yet no medical record of bipolar disorder or symptoms existed. (R. 418-19).

Dr. Dennis noted that the claimant groomed herself, cared for pets, cooked, cleaned, drove, shopped, paid bills, visited with neighbors, played with children, watched television, and read.  Dr. Dennis observed that she needed repeated verbal instructions to be repeated, had memory and concentration problems, handled stress poorly, and had altercations with family members.  (R. 420).  In her Mental Residual Functional Capacity Assessment, Dr. Dennis assessed that the claimant was not markedly limited in any category, but he found she had moderate limitations in her ability to understand and remember detailed instructions; ability to carry out detailed instructions; maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. 423).

Dr. Dennis completed a Functional Capacity Assessment that indicated that the claimant could understand, remember, and carry out simple, but not detailed, instructions; could attend to simple tasks for two hours over an eight hour day; would work best with a well-spaced work station; would require casual supervision; must have only casual contact with the general public; must receive criticism in a non-confrontational manner; would work best with few coworkers; should have only infrequent changes in the work environment; and must have help with long term planning. (R. 424).

On March 22, 2010, the claimant visited Dr. Robert Heilpern at the request of the Disability Determination Service.  The claimant stated that she suffered from chronic headaches and back pain.  Dr. Heilpern noted that her ability to do daily activities was not consistent with her claims of immobilizing back pain that limited her ability to work. (R. 426).

On August 30, 2010, the claimant met with therapist Bonne Evans at the Calhoun-Cleburne Mental Health Center for a therapy session.  Ms. Evans noted that the claimant was able to control her outbursts and get along with her brother-in-law, and the claimant worked odd jobs for money and to keep busy.  Ms. Evans assessed a GAF score in the range of 51-60. (R. 499).

On September 30, 2010, the claimant returned to Ms. Evans for another therapy session, reporting that she had no conflict with her brother-in-law and that she would divorce her husband when she received disability, move to an apartment, and continue working.  The claimant indicated that she was self-supporting through odd jobs.  She received a GAF score in the range of 61-70, meaning she experienced mild functional difficulty. (R. 501).

On October 11, 2010, the claimant received an updated evaluation and treatment plan

from James Edwards, the primary therapist at the Calhoun-Cleburne Mental Health Center and

Dr. Maurice Jetter approved it.  The claimant expressed a long-term goal of being married, having

a house, and working at the local automotive parts warehouse.  To treat her depression, she

would take medications, learn to manage stress, modify negative thoughts, exercise, and practice

social skills. (R. 506-509).

On March 14, 2011, the claimant reported to Mr. Edwards that she was doing well on the

Celexa, Trazodone, and Vistaril and had no side effects. She denied severe anxiety, depression,

or mood swings.  On April 7, 2011, the claimant saw Dr. Jetter at the Calhoun-Cleburne Mental

Health Center who assessed her with a GAF score between 51-60, signaling moderate difficulty

in functioning. (R. 511-513).  On October 20, 2011, Dr. Jetter proscribed Zoloft to address her

mood disorder.  The claimant asked Dr. Jetter if her symptoms were similar to those of Bipolar

Disorder, but he indicated that depression caused her symptoms.  The claimant's GAF score

remained in the range of 51-60. (R. 523).

On December 7, 2011, at the request of her attorney, the claimant received a

psychological evaluation from Dr. David Wilson at the Gadsden Psychological Services, LLC.

She alleged back pain that prevented her from maintaining employment, standing or walking, and

completing household chores.  She also claimed she suffered headaches and crying spells three to

four times a week.  Her speech rate was normal but she tended to mispronounce words.  She was

not hyperactive or restless and she denied having hallucinations.  She stated that her depression

stemmed from her financial problems and inability to complete chores.  To cope with her

depression, she played video games or watched a movie.  The claimant told Dr. Wilson that she

drove, did chores, played video games, cleaned her home, and used Craig's List to see what was

posted on the free section.  She also informed him that she suffered crying spells three times a week.  Dr. Wilson screened her cognition and memory in the exam and reported that the claimant gave a good effort. (R. 516-519).

Dr. Wilson gave the claimant selected subtests from the WAIS IV to formulate an idea of her mental functioning.  The claimant received a scaled score of 3 on the similarities subtest, indicating that she had poor abstract reasoning skills.  She also received a scaled score of 3 on the information subtest, showing that she had poor acquired information skills.  These scores yielded a prorated verbal IQ score of 58, indicating her verbal skills were deficient.  The claimant took the full digit span test where she obtained a scaled score of 2, highlighting severely deficient short term memory.  Dr. Wilson also gave her the reading comprehension subtest from the Weschler Individual Achievement Test.  The claimant scored a standard IQ score of 65 and a grade equivalent of second grade, indicating poor reading skills.  Dr. Wilson determined that she had significant cognitive deficits and functioned at the mild range of mental retardation.  The claimant had difficulty with understanding the information presented in the interview.  Dr. Wilson assessed that the claimant would have trouble functioning in a work environment; her status would not improve within the next twelve months; and assessed a GAF score of 45. (R. 519-520).

### ALJ Hearing

After the Commissioner denied the claimant's request for disability, the claimant requested, and received, a hearing before an ALJ. (R. 15).

At the hearing on January 5, 2012, the claimant first testified about her work history.  When questioned about her work experience as a home health aide, she responded that she did chores and helped the patient bathe and dress. An agency employed her and she worked three to

12

four hours a day. (R. 38, 43). She stated that her primary work was caring for her brother-in-law who was paralyzed from the chest down and who lived in her home. (R. 42-43). The claimant testified that several years ago she did yard work with her husband. She was unsure how long she and her husband did yard work. (R. 40). She also testified about her last job at Subway. She told the ALJ she worked there for only two weeks because she became depressed when she could not understand the food orders. She said that she did not work well with the other employees. (R. 44).

The claimant testified about her schooling. She completed the eighth grade and took special education classes. She stated that she did not pass the special education classes, but that the school continued to pass her. (R. 41-42).

The claimant testified that Dr. Jetter at the Calhoun-Cleburne Mental Health Center provided her primary mental health treatment, but that she also saw a counselor, Bonne Evans. She said that she was treated for depression, mood swings, sleeping problems, and anger problems. The claimant said the purpose of treatment centered around managing her depression and social anxiety. She stated that her mood swings forced her to stay in bed all day and caused crying fits. The claimant expressed that at times she felt angry for no reason; heard voices speaking to her; and saw visions that were not real. (R. 44-46).

Since 2009, according to her testimony, the claimant's depression worsened. She claimed her medicines made her tired. She testified that she sought treatment for sleeping problems. When asked whether she could read or understand instructions, the claimant responded that her depression and mood swings prevented her from reading for long periods of time and from following instructions. (R. 47-48). The claimant also stated that depression affected her

13

concentration and caused her to become angry.  She testified that she did not like bosses or coworkers telling her what to do and that she did not take constructive criticism well. (R. 49-51).

When asked about her physical pain, the claimant alleged constant back pain in her upper and lower back that registered between 7 and 8 on a pain scale. The pain prevented her from walking more than twenty-five feet. (R. 47).  Dr. Jetter prescribed Hydrocodone for her back pain. (R. 59).  Also, she said she experienced debilitating headaches that forced her to lie down. (R. 52).

The claimant then spoke about her daily activities.  She said three to four times a week she stayed in bed for five to seven hours.  Often her headaches prevented her from doing anything besides lying down with a cool rag on her head. (R. 51-52).  When questioned about her other daily activities, the claimant responded that she did not go to public places or social events and that her husband did the cooking and household chores.  The claimant testified that she did not work on her house or car and did not do any yard work; could only stand for 15 minutes; could not lift more than two pounds; and could not bend over, crawl, stoop, squat, climb ladders, or walk up more than one stair. (R. 52-55).

The claimant testified that her brother-in-law continued living in her home after her time as his home health aide ended.  Her brother-in-law told the agency he no longer wanted her as his health aide and would prefer another aide because of arguments with the claimant.  She also said that her husband had been in legal trouble but returned to live in the home in 2011. (R. 56-58). She participated in court-ordered mental health treatment because of her domestic violence against her brother-in-law. (R. 58-59).

Dr. William Green, a vocational expert, testified that the claimant's previous work as a

14

home attendant was a medium exertion level, semi-skilled position.  He classified her work as a yard worker as a heavy exertion level, unskilled position.  When questioning the vocational expert, the ALJ posed a hypothetical to Dr. Green about the functional capacity report issued by Dr. Larry Dennis.  The ALJ asked the vocational expert if, given the claimant's age, education, work experience, and the nonexertional limitations from Dr. Dennis' report (not being able to understand, remember, and carry out simple instructions; only attending to tasks for two hours a day over an eight hour day; working best at a well spaced work station; requiring casual supervision; needing casual contact with the general public; requiring criticism be given in a non-confrontational manner; working best with few coworkers; functioning with infrequent changes in the work place; and requiring help with long term planning), other work existed for someone within those limitations.  Dr. Green indicated that such an individual could work as a hand packager, medium exertion level, unskilled, 2,000 jobs available in Alabama and 218,000 nationally; a poultry eviscerator, light exertion, unskilled, with 3,000 jobs in Alabama and 60,000 jobs in the United States; and an electrical accessory assembler, light, unskilled with 800 jobs in Alabama and 85,000 jobs nationally.  Dr. Green testified that employers in those fields allowed one absence per month, and missing more than one day would render employment impossible. When questioned about a patient with pain registering an 8 on a pain scale, Dr. Green said that condition would preclude employment.  Similarly, Dr. Green indicated that a patient with a GAF score of 45 could not retain employment. (R. 65).

The ALJ concluded the hearing by saying that he would consider the wide range in GAF scores and that he would focus on the mental impairments.  He said the claimant would not be able to return to the home attendant work, so he would pay attention to the other potential kinds

15

of work available to the claimant.

*ALJ Opinion*

The ALJ held that the claimant was not disabled based upon the meaning of the Social Security Act from May 31, 2008 to the time of the hearing. (R. 15). First, the ALJ determined that the claimant met the insured status requirements of the Social Security Act through May 31, 2008. Next, he recognized that the claimant had not engaged in substantial, gainful employment since May 31, 2008. (R. 17). The ALJ found that the claimant suffered the following limiting, severe impairments: mood disorder; borderline intellectual functioning; and a learning disorder. The ALJ determined the claimant did not have severe physical impairments of back pain or chronic headaches. The ALJ gave great weight to Dr. Robert Heilpern's opinion that the claimant had no physical impairment because of the detailed analysis supporting his evaluation. (R. 17-18).

The ALJ found that the claimant did not have an impairment or combination of impairments to meet the required severity of § 12.04 or § 12.05. The ALJ noted that to qualify under "paragraph B" criteria, the claimant must have more than two marked limitations in daily functioning; social functioning; concentration, persistence, or pace; or episodes of decompensation. In daily living, the ALJ found that the claimant was no more than moderately restricted. The claimant told her treating and consultative doctors that she could perform daily activities such as repairing her trailer, cleaning the house, viewing Craig's List, playing online games, doing puzzles, and driving. The ALJ also determined the claimant only experienced moderate limitations in social functioning because she cared for her brother-in-law, was cooperative with doctors, went shopping, and attended church. He noted that the claimant

16

displayed no symptoms of anxiety and denied having uncontrollable angry outbursts. He determined that her domestic violence indicated that she was mildly impaired in social functioning. Next, regarding concentration, persistence, or pace, the ALJ opined that the claimant was only moderately limited. The ALJ assessed that her medical records indicated she could concentrate for longer than her alleged capability. He noted that the claimant could not pay attention, had a borderline IQ, and took special education classes in school. Finally, he articulated that the claimant did not experience any episodes of decompensation. The ALJ held that the claimant did not satisfy two marked limitations and, therefore, did not satisfy "paragraph B" criteria. (R. 18-19).

Next, the ALJ found that the claimant did not meet the § 12.05 requirements. The ALJ made note of the claimant's argument that Dr. David Wilson's examination showed a verbal IQ score of 58. The ALJ articulated that the score differed greatly from the scores she received at age 16. He determined that the variance between the scores undermined the validity of Dr. Wilson's partial test. The ALJ found no intervening incident to cause such a dramatic change in the claimant's IQ scores. The ALJ further reasoned that, even if Dr. Wilson's test results were correct, § 12.05 requires the mental impairment to manifest itself before age 22. No objective evidence supported a finding that the claimant's mental impairment appeared before age 22, given that her IQ at age 16 was 73. Further, the ALJ considered that Dr. Wilson's test results were influenced by incomplete information because Dr. Wilson did not include her IQ scores from age 16. The ALJ did not conclusively establish whether Dr. Wilson intentionally omitted the scores from his report or if the claimant did not share them with him. (R. 20).

Despite not meeting the technical requirements of § 12.05, the ALJ observed that the

17

claimant's adaptive functioning skills were greater than her IQ.  The ALJ noted that consultative

psychologist, Dr. Larry Dennis, also arrived at this conclusion.  He described that the claimant

proved her ability to function in society by having her driver's license, being able to navigate long

distances, communicating online, completing chores, repairing her trailer, and reading Craig's

List postings.  Further, he articulated that the claimant worked for a number of years despite

borderline intellectual functioning. (R. 20-21).

The ALJ determined that the claimant had the residual functional capacity to perform a

full range of work at all exertional levels with the following nonexertional limitations: can

understand, remember, and carry out simple, not detailed, instructions; can do simple tasks for

two hours; must have a well-spaced work station; needs casual supervision; must receive

criticism in a non-confrontational way; must have casual contact with the general public; and

needs assistance with long term planning. (R. 21).

The ALJ arrived at this decision by determining that the objective evidence did not

support the claimant's allegations that physical or mental impairments inhibited her work ability.

The ALJ noted that the record directly conflicted with the claimant's testimony that she regularly

wants to stay in her home; suffers from hallucinations; has crying spells; and has worsening

depression that keeps her from concentrating, drains her energy, and prevents her from receiving

criticism.  The claimant reported to doctors that, after taking medication, her symptoms were

reduced and her mood swings were controlled.  The ALJ found that the record showed that she

no longer had outbursts and that her GAF score increased.  He noted that, by 2010 to 2011, the

claimant's treating doctors reported she only had mild to moderate symptoms.  The ALJ reported

that in December 2011, the claimant's mental status was normal, despite being off medication for

18

one month; she had a plan to divorce her husband upon receiving disability; and she could prepare meals for her family. (R. 22-23).

The ALJ evaluated the claimant's two psychological examinations. The first, in March 2010 by Dr. Robert Summerlin, indicated that, despite her low average IQ, the claimant was fully oriented and had a GAF score of 60. Next, the ALJ reviewed Dr. David Wilson's 2011 evaluation of the claimant where he noted that she had poor mental control, scored a 58 on the verbal section of the IQ test, and had a GAF score of 45. The ALJ gave Dr. Wilson's opinion marginal weight because his report was vastly different than those issued by her treating doctors who assessed a GAF score of 71-80, indicating only transient symptoms. The ALJ noted that Dr. Wilson had no ongoing relationship with the claimant, yet diagnosed her with severe symptoms. (R. 23-24).

Further, the ALJ gave Dr. Larry Dennis' evaluation of the claimant significant weight because it corresponded with the claimant's medical history that showed the claimant's condition was moderate to mild in severity. The ALJ gave little weight to Dr. James Yates' comment that the claimant had attention deficit disorder because that comment was based on the claimant's subjective statements and she was never treated for an attention disorder.

The ALJ afforded the claimant's testimony little weight because it conflicted with her medical records. The claimant testified that she had hallucinations, but she told Dr. David Wilson that she did not have hallucinations; she testified that her symptoms had worsened since 2009, but her records indicate she reported that her symptoms have improved by 2011 to the point of only being mild and transient; she testified that her medications make her sleepy, but told her doctors that her medications did not cause side effects; and she testified that she has angry

19

outbursts, but told her doctor she did not have outbursts. (R. 24).

The ALJ found that the claimant had no past relevant work so transferability of job skills was not an issue. (R. 25).  The ALJ found that the claimant could perform jobs based upon her residual functional capacity, age, education, and work experience in conjunction with Dr. Green's testimony, and that the claimant only had nonexertional limitations.  Based on the vocational expert's testimony, the ALJ determined that the claimant would work as a hand packager (medium, unskilled) of which 218,000 jobs exist nationwide and 2,000 statewide; a poultry eviscerator (light, unskilled) of which 60,000 jobs exist nationally and 3,000 regionally; and an electrical accessory assembler (light, unskilled) of which 85,000 jobs exist in the nation and 800 jobs in the state. (R. 26).

The ALJ ultimately determined that the claimant was not disabled as defined in the Social Security Act, from May 31, 2008 to the date of the decision.

## VI. DISCUSSION

The claimant argues that she has a valid IQ score to prove subaverage intellectual functioning and sufficient deficits in adaptive functioning to satisfy § 12.05(C) for mental retardation.  The court disagrees.

The ALJ accurately determined that the claimant did not satisfy the requirements for § 12.05(C): "A valid verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  The claimant participated in three IQ tests throughout her lifetime: at age 12, at age 16, and at age 39. (R. 262, 285, 519).  The ALJ determined that the claimant's IQ score of 73 from her 1987 test at age 16 was her valid IQ score and that she did not satisfy the requirements for § 12.05(C).

20

First, substantial evidence bolsters the ALJ's discrediting of the claimant's IQ score from age 12 because those results were no longer valid.   According to the Social Security Administration's listings, IQ test scores from children ages 7 to 15 are only considered valid for two years if the tested IQ score is over 40. 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(D)(10).  Therefore, nearly twenty-five years after the claimant took the IQ test at age twelve, the 1983 test is no longer valid and should not be used in consideration of the claimant's measured intelligence.

Substantial evidence also supports the ALJ's finding that the claimant's IQ score from age is 16 valid.  IQ scores from individuals age 16 and older are valid because they provide more stable results. 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(D)(10).  Thus, the claimant's IQ score of 73 from 1987 is valid, and the ALJ properly applied it in determining that the claimant did not meet § 12.05(C).

Also, substantial evidence exists to support the ALJ's discrediting of her verbal IQ score of 58 assessed at age 39 by Dr. Wilson.  The verbal IQ score of 58 from Dr. Wilson's exam was radically different than her valid, full-scale IQ score of 73 at the age of 16.  The ALJ found that this drastic variance in scores decreased the validity of Dr. David Wilson's test.  The ALJ noted that Dr. Wilson administered only a partial IQ test, without complete information about the claimant's full IQ score history.  The ALJ correctly determined that a score from a partial test is not as reliable as scores from a complete IQ test.  Dr. Wilson's report from the partial IQ test only cited the claimant's age 12 results and did not mention the age 16 scores.  Even more, the ALJ also noted that no intervening incident in the claimant's medical history could account for such a dramatic decrease in mental capacity after the age of 16.  Substantial evidence reinforces the ALJ's reasoning that Dr. Wilson's partial test, founded on incomplete information, lessens the credibility of his report.

21

Next, the ALJ determined that, even if the claimant had met the technical IQ requirements for § 12.05(C), the claimant did not prove the requisite deficits in adaptive functioning. The court finds that substantial evidence supports the ALJ's determination that the claimant had a valid IQ score of 73 and no marked deficits existed in her adaptive functioning skills.

Adaptive functioning is an "individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." Programs Operations Manual System DI 24515.056(D)(2). The ALJ based his finding upon evaluations by three different mental health doctors on three separate occasions, two of whom found that the claimant's adaptive functioning was higher than her IQ. He noted that Dr. Robert Summerlin evaluated the claimant for the Disability Determination Service and determined that her adaptive functioning was greater than her IQ based upon the claimant's medical history. Further, the ALJ relied on Dr. Larry Dennis' consultative, psychiatric review of the claimant to determine that the claimant experienced moderate limitations in performing daily activities; social functioning; concentration, persistence, or pace; and did not experience decompensation.

Moreover, both of these reports provide substantial evidence to support the ALJ's determination that the claimant did not have marked limitations in adaptive functioning. According to § 12.05(C), deficits in adaptive functioning must manifest before age 22. Based upon the claimant's medical history in the record, no intervening event occurred between age 16 and 22, or at any other point in her life, that created deficits in adaptive functioning, thus, supporting the ALJ's finding that the claimant did not meet § 12.05(C).

Dr. David Wilson's examination was the only report that diagnosed the claimant with significant occupational limitations. Dr. Wilson determined that the claimant's level of functioning

was so low that she would be unable to function in a work environment.  The ALJ properly discredited Dr. Wilson's assessment noting that he administered only a *partial* IQ test based upon incomplete information.  Substantial evidence bolsters the ALJ's determination that Dr. Wilson's material omission of the claimant's IQ score of 73 at age 16 undermined his ultimate determination.

The court finds that substantial evidence also supports the ALJ's finding that the claimant's daily activities demonstrated that her functional capacity was greater than her measured intellect. For instance, the claimant had a driver's license and drove her car; enjoyed doing puzzles and playing games online, showing her ability to concentrate and make mental connections; completed daily chores such as cooking, cleaning, and taking care of herself and others; and worked for many years despite her mental functioning, showing her ability to work and function in society. (R. 20-21).

This court finds that substantial evidence supports the finding that the claimant's mental impairments did not satisfy § 12.05 because she had a valid IQ score of 73 and that she did not have the requisite deficits in adaptive functioning manifested before the age of 22.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.  The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 24th day of September, 2014.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

23